**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

MOHIT SHARMA, individually and on behalf of all others similarly situated,

                              Plaintiff,

              v.

HELLO SUGAR, LLC,

                              Defendant.

Case No.  2:25-cv-11468

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Mohit Sharma ("Plaintiff") brings this action on behalf of himself, and all others similarly situated (the "Class Members") against Defendant Hello Sugar, LLC ("Defendant" or "Hello Sugar"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

## INTRODUCTION

1.     This is a class action lawsuit brought on behalf of all U.S. residents who accessed and navigated www.hellosugar.salon (the "Website") and whose electronic communications were intercepted or recorded by third parties Meta Platforms, Inc. ("Facebook" or "Meta"), Google LLC (Google), and TikTok Ltd. ("TikTok") (collectively "Third Parties").

2.     Defendant is "a national franchise of tech-driven Brazilian wax, sugar & laser salons."[1] Waxing, sugar, and laser services involve inherently sensitive information due to the personal nature of the services provided. Defendant is aware of the sensitive nature of the services it offers yet fails to inform its customers of the Third Parties' tracking technologies incorporated onto the Website.

3.     Defendant aids, agrees with, employs, or otherwise enables multiple third parties—Meta, Google, and TikTok—to eavesdrop on communications sent and received by Plaintiff and Class Members on the Website that Defendant owns and operates, including communications that contain sensitive and personal information. By failing to procure consent before enabling the Third Parties to intercept these communications, Defendant violated the Electronic Communications Privacy Act ("ECPA"), California Invasion of Privacy Act ("CIPA") § 631, CIPA § 632, and the California Constitution.

---

[1] LinkedIn, Hello Sugar: About Us,
https://www.linkedin.com/company/hellosugar.

**PARTIES**

4.      Plaintiff Mohit Sharma is a resident and citizen of Culver City, California.

5.      At all relevant times, Plaintiff maintained active accounts with Facebook and Google.  When creating his Facebook and Google accounts, Plaintiff provided Facebook and Google with his personally identifiable information ("PII"), including his full name, date of birth, phone number, and email address.  Plaintiff used the same device to access the Website that he did to access his Facebook and Google accounts.

6.      In or around June of 2025, while in California, Plaintiff visited the Website to schedule an appointment at Defendant's Los Angeles-Westwood Location.  Unbeknownst to Plaintiff, Defendant intercepted and disclosed his communications to unknown Third Parties—including communications that contained his PII—as well as private information related to Plaintiff's appointment, including the specific services he was receiving.  Neither Defendant nor the Third Parties procured Plaintiff's consent prior to these interceptions, nor was Plaintiff on notice of the fact that such interceptions were occurring.

7.      Defendant Hello Sugar, LLC is an Arizona corporation with its headquarters located in Mesa, Arizona.  Defendant owns and operates the Website and chose to install the tracking technologies provided by the Third Parties onto its Website.

8.      Defendant knowingly and intentionally incorporated a host of tracking technologies for marketing, advertising, and analytics purposes on the Website without disclosure to its users.

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511).  This Court also has supplemental

1    jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.  Further, this

2    action is a putative class action, and Plaintiff alleges that at least 100 people

3    comprise the proposed class, that the combined claims of the proposed class

4    members exceed $5,000,000 exclusive of interest and costs, and that at least one

5    member of the proposed class is a citizen of a state different from the defendant.

6        10.    This Court has personal jurisdiction over Defendant because it

7    purposefully directs its business activities in this District by offering its services to

8    residents of this District and performing services within this District.  Further,

9    Plaintiff was residing in this District when he accessed the Website and had the

10    Tracking Technologies installed on his device, which Defendant knew would cause

11    harm throughout California, including within this District.

12        11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because

13    Defendant does substantial business in this District, a substantial part of the events

14    giving rise to the claim occurred in this District, and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

**A.    Overview of the California Invasion of Privacy Act And
The Federal Wiretap Act**

17        12.    The California Legislature enacted CIPA to protect certain privacy

18    rights of California citizens.  The California Legislature expressly recognized that

19    "the development of new devices and techniques for the purpose of eavesdropping

20    upon private communications . . . has created a serious threat to the free exercise of

21    personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal

22    Code § 630.

23        13.    The California Supreme Court has repeatedly stated the "express

24    objective" of CIPA is to "protect a person placing or receiving a call from a situation

25    where the person on the other end of the line *permits an outsider to tap his telephone*

26    *or listen in on the call.*"  *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis

27    added).

14.   Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

15.   As part of CIPA, the California Legislature introduced § 631(a), which imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978). Specifically, CIPA § 631(a) prohibits any person or entity from:

(i)   "intentionally tap[ping], or mak[ing] any unauthorized connection . . . with any telegraph or telephone wire";

(ii)   "willfully and without the consent of all parties to the communication . . . read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or

(iii)   "us[ing], or attempt[ing] to use . . . any information so obtained."

16.   CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

17.   Similarly, § 632 penalizes:

> "A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    4

> amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio"

18.     Individuals may bring an action against a violator of CIPA for $5,000 per violation.  Cal. Penal Code § 637.2.

19.     In a manner similar to CIPA, the Federal Wiretap Act (i.e., the ECPA) creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."[2]

20.     Although the ECPA does not apply if a "person is a party to the communication or one of the parties to the communication has given prior consent to such interception" the ECPA eliminates the one-party consent exception when the conduct was for the "the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[3]

**B.     Defendant's Website**

21.     Defendant owns and operates the Website.  Unbeknownst to users, Defendant integrated the Meta Pixel, Google tracking technologies, and TikTok Pixel (collectively the "Tracking Technologies") into the Website to assist with its marketing efforts.

22.     When prospective clients access the Website, Defendant fails to inform them that it will intercept and disclosure their private communications to Third Parties, including communications regarding their sensitive appointment details.

23.     Defendant fails to provide a link to a conspicuous privacy policy despite its legal obligation to do so under sections 7010 and 7011 of the California Code of Regulations and section 22575 of the California Business and Professions Code. Cal.

---

[2] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).

[3] 18 U.S.C. § 2511(c)–(d).

1    Code Regs. tit. 11, §§ 7010–11;[4] Cal. Bus. & Prof. Code § 22575.[5]

2        24.    Unbeknownst to its clients, Defendant systematically discloses sensitive

3    and confidential appointment booking details and PII to numerous third parties.

4        25.    As courts across the country have recognized, the identifiers that the

5    Tracking Technologies capture—email address, phone number and social media

6    IDs—constitute "directly personal information."  By capturing this information

7    without disclosing its practices, Defendant fails to receive consent from visitors to

8    intercept their communications.

9        **C.**    **Tracking Technologies, Generally**

10        26.    Web browsers are software applications that allow users to navigate the

11    internet and view and exchange electronic information and communications.  Each

12    device (such as a computer, tablet, laptop, or smartphone) accesses web content

13    through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

14        27.    Every website is hosted by a computer server that holds the website's

15    contents and through which the entity in charge of the website exchanges

16    communications with the user's device via web browsers.

17        28.    Web communications consist of HTTP Requests and HTTP Responses

18    and any given browsing session may consist of thousands of individual HTTP

19    Requests and HTTP Responses, along with corresponding cookies:

20        •    <u>HTTP Request</u>: an electronic communication sent from a device's
21        browser to the website's server.  GET Requests are one of the most
22        common types of HTTP Requests.  In addition to specifying a particular

---

[4] Cal. Code Regs. tit. 11, § 7011(d) requires "[t]he privacy policy . . .  be posted online and accessible through a conspicuous link that complies with section 7003, . . . using the word "privacy" on the business's website homepage(s) . . . ."

[5] Cal. Bus. & Prof. Code § 22575 requires "An operator of a commercial Web site or online service that collects personally identifiable information through the Internet about individual consumers residing in California who use or visit its commercial Web site or online service shall conspicuously post its privacy policy on its Web site . . . ."

URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

•    <u>Cookies</u>: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

•    <u>HTTP Response</u>: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

29.    A user's HTTP Request essentially asks the website to retrieve certain information (such as payment submissions and user selections), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the user's screen as they navigate the Website).

30.    Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

31.    Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The Meta Pixel, Google Tracking Technologies, and TikTok Pixel, embedded on the Website by Defendant, constitute Source Code.

**D.    Meta's Tracking Technology**

32.    Meta is one of the largest advertising companies in the country. To

date, Meta generates nearly 98% of its revenue through advertising,[6] bringing in an excess of $160 billion in 2024.[7]

33.    Meta's advertising business began back in 2007 with the creation of "Facebook Ads," which was marketed as a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads."[8]

34.    Today, Meta provides advertising on its own platforms, such as Facebook and Instagram, as well as websites outside these apps through the Facebook Audience Network.  Facebook alone has more than 3 billion active users.[9]

35.    Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level.  "Among many possible target audiences, [Meta] offers advertisers," for example, "1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[10]

36.    Given the highly specific data used to target specific users, it is no surprise that millions of companies and individuals utilize Meta's advertising

---

[6] Emmanuel Oyedegi, *Meta's ad business generated 98% of its total revenue in Q2 2025*, TECHLOY (Jul. 31, 2025) https://www.techloy.com/metas-ad-business-generated-98-percent-of-its-total-revenue-in-q2-2025/.

[7] Stacy Jo Dixon, *Meta's ad business generated 98% of its total revenue in Q2 2025*, STATISTA (Jan. 30, 2025) https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/?srsltid=AfmBOopC65RAw3WSm3y4ZtdYBpTiXhsmiFK7kSnFcm14WOV7esTu_uQ_ https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/?srsltid=AfmBOopC65RAw3WSm3y4ZtdYBpTiXhsmiFK7kSnFcm14WOV7esTu_uQ_

[8] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

[9] Naveen Kumar, *Facebook Users Statistics (2025) – Latest Worldwide Data*, DEMANDSAGE (Aug. 19, 2015) https://www.demandsage.com/facebook-statistics/.

[10] Natasha Singer, *What You Don't Know About How Facebook Uses Your Data*, NEW YORK TIMES (Apr. 11, 2018) https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html.

services.  Meta generates substantially all of its revenue from selling advertisement placements:[11]

**Table 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|
| 2021 | $117.93 billion | $114.93 billion | 97.46% |
| 2020 | $85.97 billion | $84.17 billion | 97.90% |
| 2019 | $70.70 billion | $69.66 billion | 98.52% |
| 2018 | $55.84 billion | $55.01 billion | 98.51% |

37.     One of Meta's most powerful advertising tools is the Meta Pixel, formerly known as the Facebook Pixel, and its SDK, which launched in 2015.

38.     Meta touted the Meta Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."  According to Meta, to use Meta Pixel an advertiser need only "place a single pixel across [its] entire website to report and optimize for conversions" so that the advertiser could "measure the effectiveness of [its] advertising by understanding the action people take on [its] website."[12]

39.     The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activity as the users navigate through a website.  As soon as a user takes any action on a webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring.

40.     Through this technology, Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website and what they searched.  The Meta Pixel sends each of these pieces of information to

---

[11] *Facebook Ad Revenue (2017–2027),* OBERLO, https://www.oberlo.com/statistics/facebook-ad-revenue.

[12] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

Meta with other identifiable information, such as the user's IP address. Meta stores this data on its own server, in some instances, for years on end.

41.    This data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits Defendant's Website, Meta receives third-party cookies allowing Meta to link the data collected by Meta Pixel to the specific Facebook user.

42.    For example, Meta uses cookies named c_user, datr, fr, and fbp to identify its account holders. Meta stores or updates Meta-specific cookies every time a person accesses their Facebook account from the same web browser.

43.    The Meta Pixel can access these cookies and send certain identifying information like the user's Facebook ID to Facebook along with the other data relating to the user's website inputs.

44.    The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

45.    A User's Facebook ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the User, including pictures, personal interests, work history, relationship status, and other details. Because the User's Facebook Profile ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the User's corresponding Facebook profile. To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

46.    The Facebook datr cookie identifies the User's web browser. It is an identifier unique to each person's specific web browser and is another way Facebook can identify Facebook users.

---

47.     The Facebook fr cookie is a combination of the Facebook ID (c_user) and the browser ID (datr) cookie values.

48.     A User who accessed Defendant's Website while logged into (or recently having logged into) Facebook would have their browser transmit the c_user, datr and fr cookies to Facebook.

49.     At each stage, Defendant also utilized the _fbp cookie, which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.

50.     Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails, and phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click and view related to the shopping and products sought from Defendant).

51.     Meta can also link the data to a specific user through the "Facebook Cookie." The Facebook Cookie is a workaround to recent cookie-blocking techniques, including one developed by Apple, Inc., to track users, including Facebook users.

52.     Lastly, Meta can link user data to individual users through identifying information collected through Meta Pixel using what Meta calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching. Using Manual Advanced Matching the website developer manually sends data to Meta to link users. Using Automatic Advanced Matching, the Meta Pixel scours the data it receives to search for recognizable fields, including name and email address to match users to their Facebook accounts.[13]

53.     Importantly, even if Meta Pixel collects data about a non-Facebook

---

[13] While Meta purports to "hash" the PII provided by customers, Meta actually uses the hashed format *specifically to link the Meta Pixel data to Facebook profiles*.

user, Meta still retains and uses the data collected through Meta Pixel in its analytics and advertising services. These non-users are referred to as having "shadow profiles" with Meta.[14]

54.  At the time Plaintiff used Defendant's Website, he maintained an active social media account on Facebook. Plaintiff accessed the Defendant's Website from the same device he used to visit Facebook, and Meta associated the data it collected about him from Defendant's Website with his Facebook account and other PII. Meta was also able to associate this information with his identity by matching hashed identifiers (name, phone, email, and address) to its own records.

55.  Meta offers an analogous mobile version of the Meta Pixel known as an SDK to app developers. Meta's SDK allows app developers "to track events, such as a person installing your app or completing a purchase." By tracking these events developers can measure ad performance and build audiences for ad targeting.[15]

56.  Meta's SDK collects three types of App Events. Automatically Logged Events are "log[] app installs, app sessions, and in-app purchases." Standard Events are "popular events that Facebook has created for the app." Custom Events are "events [the app developers] create that are specific to [the] app."[16]

57.  Once the data intercepted through the Meta Pixel or SDK is processed, Meta makes this data available through its Events Manager and Ads Manager pages, along with tools and analytics to reach these individuals through future Facebook ads. For instance, this data can be used to create "custom audiences" to target the user, as well as other Facebook users who match members of the audiences'

---

[14] Jürgen Graf, *Investigating shadow profiles: The data of others*, TECHXPLORE (Sept. 22, 2023) https://techxplore.com/news/2023-09-shadow-profiles.html.

[15] *Meta App Event Tracking*, META, https://developers.facebook.com/docs/app-events/.

[16] *Meta App Event Tracking: Overview*, META, https://developers.facebook.com/docs/app-events/.https://developers.facebook.com/docs/app-events/overview.

criteria.[17]

58.    In addition to using the data intercepted through Meta Pixel and SDK to provide analytics services, Meta uses this data to improve its personalized content delivery, advertising network, and machine-learning algorithms, including by improving its ability to identify and target users.

59.    Meta has no way to limit or prohibit the use of data collected through Meta Pixel and its SDK given Meta's open systems and advanced algorithms.

60.    According to leaked internal Meta documents, one employee explained "You pour that ink [i.e., data] into a lake of water . . . at it flows . . . everywhere . . . How do you put that ink back in the bottle?  How do you organize it again, such that it only flows to the allowed places in the lake?"[18]

61.    In these same leaked documents, another employee explained Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, that is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation."[19]  Thus, once the data enters the Meta system, either through its SDK or Pixel, the data can be used for any and all purposes.

62.    Meta's own employees confirmed no one at Meta can state confidently where all the data about a user is stored and used.  In a recent court hearing as part of the Cambridge Analytica scandal of 2018, Meta's own engineers testified there was not a "single person" at Meta who could answer that question.[20]

---

[17] *Audience Network*, META, https://developers.facebook.com/docs/app-events/overview.https://developers.facebook.com/docs/audience-network/.

[18] Lorenzo Franceschi-Bicchierai, *Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document*, VICE, (Apr. 26, 2022) https://www.vice.com/en/article/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes/.

[19] *Id.*

[20] Isober Asher Hamilton, *Senior Facebook engineers say no one at the company knows where your data is kept*, BUSINESS INSIDER, (Sept. 8. 2022)

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    13

63.     Defendant uses at least the Meta Pixel on its Website.  As a result, Defendant disclosed and Meta intercepted users'—including Plaintiff's—interactions on the Website.  Meta received at least the customer's name, email, location, and purchase information which it could associate with embedded cookies to further associate the information with the customer's profile.  Meta and Defendant used this data, as well as other data uploaded directly to Meta by Defendant, so that Defendant could run advertisements using its services.

64.     Plaintiff did not consent to the interception or disclosure of his data to Meta.  Defendant's disclosure, and Meta's interception, of Plaintiff's and prospective class members' PII without their consent is an invasion of privacy and violates several laws, including ECPA (18 U.S.C. §2511, *et seq.*), CIPA §631, CIPA §632, and the California State Constitution.

**E.     Google's Tracking Technology**

65.     Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars.  Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

66.     Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[21]  In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year.  Google generated an even higher percentage of its total revenues from advertising in prior years:

---

https://www.businessinsider.com/meta-doesnt-know-where-all-your-data-is-engineers-say-2022-9#:~:text=Two%20Meta%20engineers%20were%20grilled,there%20for%20almost%20nine%20years.

[21] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

**Table 2:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|--------------|------------|--------------|
| 2021 | $257.6 billion | $209.5 | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

67.    Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

68.    One of these SDKs and tracking pixels is Google Analytics.  Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

69.    Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior.  Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

70.    In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

71.    Since launching Google Analytics, Google has become one of the most

popular web analytics platforms on the internet.  Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

72.    Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[22]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[23]

73.    Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a customer is using to access a website.  The device information intercepted by Google includes the customer's operating system, operating system version, browser, language, and screen resolution.

74.    In other words, when interacting with the Website, an HTTP Request is sent to Defendant's server, and that server sends an HTTP Response including the Markup that displays the website visible to the customer and Source Code, including Google Analytics.

75.    Defendant is essentially handing customers a tapped device.  Once the webpage is loaded onto the customer's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which

---

[22] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/.
[23] *Id.*

intercepts those communications intended only for Defendant, and transmits those communications to third parties like Google.

76.    Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters.  Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

77.    After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages.  These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

78.    In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

79.    The Website utilizes Google's pixel and SDK.  As a result, Google intercepted customers' interactions on the Website, including their PII and purchase details.  Google received at least "Custom Events" and URLs that disclosed the product information and identified the user.  Google also received additional PII, including the customers' IP address, device information, and User-IDs.

80.    For example, the Website utilizes Google's "cid" or "Client ID"

function to identify customers as they navigate the Website.[24]

81.    In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify clients.  A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

82.    These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

83.    As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[25]

84.    The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[26]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

85.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[27]

86.    Browser-fingerprints are personal identifiers.  Google Analytics can collect browser-fingerprints from website visitors.

---

[24] Eduard Kozakov, *What Is Google Client ID In GA4: Detailed Setup Guide For 2024*, OWOX, https://www.owox.com/blog/use-cases/google-analytics-client-id.

[25] Justin Schuh, *Building a more private web*, GOOGLE, https://blog.google/products/chrome/building-a-more-private-web/.

[26] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY, https://www.pixelprivacy.com/resources/browser-fingerprinting.

[27] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017) https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

---

87.     As enabled by Defendant, Google collects vast quantities of client data through Google Analytics.

88.     Due to the vast network of client information held by Google, it is able to match the IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity.

89.     Google then utilizes such information for its own purposes, such as targeted advertising.

90.     Plaintiff did not consent to the interception or disclosure of his data to Google.  Defendant's disclosure, and Google's interception, of Plaintiff's and prospective class members' PII without their consent is an invasion of privacy and violates several laws, including ECPA (18 U.S.C. §2511, *et seq.*), CIPA §631, CIPA §632, and the California State Constitution.

**F.     TikTok's Tracking Technology**

91.     TikTok offers an SaaS called the TikTok Pixel, which helps businesses track the performance of their ads by sending information from the business's website to TikTok, who then uses that information to optimize ad campaigns on TikTok and across the internet.[28]

92.     The TikTok pixel can be "plugged in" to any website, as the pixel is a piece of code that can be added to any website to capture "events" (any activity by a user that happens on a website).

93.     The TikTok Pixel is part of a package of prebuilt software tools under the "TikTok for Business" product line that allow the delivery of personalized ads. By employing TikTok to collect user information through the TikTok Pixel, websites that procure TikTok's services can use the information to deliver more effective targeted advertisements, increasing revenue for the websites.

---

[28] "TikTok Pixel 101: What It Is & How to Use It," https://popupsmart.com/blog/tiktok-pixel (Last accessed December 27, 2023).

94.     In short, when users interact with a webpage with the TikTok Pixel installed, the TikTok Pixel collects the "Metadata and button clicks" (information about what the user clicked on—such as the specific URL address visited by the user— or text entered into the webpage), a timestamp for the event, and the visitor's IP address.[29]  That information is sent automatically to TikTok.

95.     The "TikTok for Business" business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the TikTok Pixel.

96.     Thus, through websites that employ TikTok's services, TikTok directly receives the electronic communications of website visitors via button clicks, text boxes, etc.

97.     On each page on Defendant's Website that a user visits (where the TikTok Pixel is installed), TikTok collects the URL value of the page visited, an identification code TikTok uses to track the user, and the visitor's browser type and operating system.

98.     When the TikTok Pixel is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, the TikTok Pixel involves TikTok, a separate and distinct third-party entity from the parties in the conversation, using the TikTok Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because TikTok itself is collecting the content of any conversation.  That information is then analyzed by TikTok before being provided to any entity that was a party to the conversation (like Defendant).

99.     Once TikTok intercepts website communications, it has the capability to use such information for its own purposes.  TikTok's Commercial Terms of Service grant TikTok "a non-exclusive, royalty-free, worldwide, transferable, sublicensable

---

[29] *About TikTok Pixel*, TikTok Business Help Center (Mar. 2025) https://ads.tiktok.com/help/article/tiktok-pixel?redirected=2).

license to access, use, host, cache, store, display, publish, distribute, modify and adapt [information collected from partner websites] in order to develop, research, provide, promote, and improve TikTok's products and services."[30]

100.    In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that TikTok can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing TikTok to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new TikTok Business products and services, or improve pre-existing TikTok Business products and services.

101.    One of TikTok's partners is Defendant.  The TikTok Pixel is employed on the Website in the manner described throughout this Complaint.

102.    Plaintiff did not consent to the interception or disclosure of his data to TikTok.  Defendant's disclosure, and TikTok's interception, of Plaintiff's and prospective class members' PII without their consent is an invasion of privacy and violates several laws, including ECPA (18 U.S.C. §2511, *et seq.*), CIPA §631, CIPA §632, and the California State Constitution.

**G.    Defendant's Use Of The Tracking Technologies**

103.     Pursuant to agreements with Third Parties (e.g., Meta, Google, and TikTok), Defendant intentionally and voluntarily embedded the Tracking Technologies on the Website.  As illustrated within this section, Defendant unlawfully disclosed personally identifiable information and sensitive appointment details via the Tracking Technologies to Third Parties, without customers' consent.

104.    The Tracking Technologies are Source Code that do just that—they surreptitiously transmit a Website User's communications and inputs to the

---

[30] *TikTok For Business Commercial Terms Of Service*, TIKTOK FOR BUSINESS, https://ads.tiktok.com/i18n/official/
policy/commercial-terms-of-service (Last updated March 2025).

corresponding user IDs, much like a traditional wiretap.

105.   For example, when individuals visit Defendant's Website via an HTTP request to Defendant's server, Defendant's server sends an HTTP response (including the Markup) that displays the webpage visible to the User, along with Source Code (including the Tracking Technologies).

106.   Thus, Defendant is, in essence, handing its customers a tapped website and, once a webpage is loaded into the customer's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Tracking Technologies, which then intercept those communications—intended only for Defendant—and instantaneously transmit those communications to Meta, Google, and TikTok, or other third parties.

107.   Third Parties—including Meta, Google, and TikTok—offer companies, including Defendant, snippets of code they can install in web browsers of users logged into their services.  These code snippets uniquely identify the user and are sent with each intercepted communication to ensure the third party can identify the specific user associated with the information intercepted (in this case, confidential PII and appointment information).

108.   Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails, and phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click, and view related to the shopping and products sought from Defendant).

109.   Defendant installs these Tracking Technologies despite its understanding that its customers reasonably expect their sensitive and identifiable information to be kept confidential and undisclosed to Third Parties.

110.   From the moment clients enter Defendant's Website, Defendant begins tracking and disclosing their interactions with the Website to the Third Parties.

111.   When users access the Website, Defendant discloses the URLs of every page that they visit, including during the booking process.  The URLs disclose the location of the appointment, and the type of procedure.  For example, when a client clicks on the type of procedure they are booking, the URL of the page for that procedure, which includes information about the procedure and appointment location is shared with Third Parties as enabled by Defendant.  *See e.g.* Fig. 1 (Meta disclosures); Fig. 2 (Google Analytics disclosures); Fig. 3 (Google Doubleclick disclosures); Fig. 4 (TikTok disclosures).



**Figure 1** (Black Box: Data Disclosed; Blue Box: Cookie Values)

| | |
|---|---|
| v | 2 |
| tid | G-9LR0PEMCXZ |
| gtm | 45je5bi0h1v9101446706za200zb893372934zd893372934 |
| _p | 1763587417608 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| gdid | dZjQwMz |
| cid | 1851876229.1763417289 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium;142.0.7444.163|Google%20Chrome;142.0.7444.163|Not_A%20Brand;99.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AEAAAAQ |
| _s | 12 |
| tag_exp | 103116026~103200004~104527907~104528500~104684208~104684211~105322303~115583767~115938466~115938468~116217636~116217638~116251935~116251937~116474638 |
| dl | https://www.hellosugar.salon/salon-finder?state=California&location=CA%20Montebello%20%7C%20Montebello%20Mix%2017 4&service=Buttocks%20Strip%20Wax&category=Buttocks |
| dr | https://www.hellosugar.salon/salon-finder?state=California&location=CA%20Montebello%20%7C%20Montebello%20Mix%2017 4&items=Buttocks%7CButtocks%20Strip%20Sugar%3BButtocks%7CButtocks%20Strip%20Wax%3B |
| sid | 1763585890 |
| sct | 3 |
| seq | 1 |

**Figure 2**



| | |
|---|---|
| random | 1763588556322 |
| cv | 11 |
| fst | 1763588556322 |
| bg | ffffff |
| guid | ON |
| async | 1 |
| en | page_view |
| gtm | 45je5bi0h1v898004156za200zb893372934zd893372934xec |
| gcd | 13l3l3l3l1l1 |
| dma | 0 |
| tag_exp | 103116026~103200004~104527907~104528500~104684208~104684211~105322302~105446120~115583767~115938469~116217636~116217638~116251935~116251937~116474638 |
| u_w | 2560 |
| u_h | 1440 |
| url | https://www.hellosugar.salon/salon-finder?state=California&location=CA%20Montebello%20%7C%20Montebello%20Mix%2017 4&service=Buttocks%20Strip%20Wax&category=Buttocks |
| ref | https://www.hellosugar.salon/salon-finder?state=California&location=CA%20Montebello%20%7C%20Montebello%20Mix%2017 4&items=Buttocks%7CButtocks%20Strip%20Sugar%3BButtocks%7CButtocks%20Strip%20Wax%3B |
| frm | 0 |
| did | dZjQwMz |
| gdid | dZjQwMz |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| auid | 2039003688.1763417289 |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium;142.0.7444.163|Google%20Chrome;142.0.7444.163|Not_A%20Brand;99.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |

| Name | Value | ▲ Domain |
|---|---|---|
| ar_debug | 1 | .doubleclick.net |
| DSID | AEhM4Mfhg6JzDG0xbHUipYoPJymA-P94K7obIBCTbuRkqKEXvnkF... | .doubleclick.net |
| IDE | AHWqTUkXMfyzwtpv0mdOLeK4U2zVdQgmU6GWLY3UKR9FsUFC... | .doubleclick.net |

**Figure 3** (Black Box: Data Disclosed; Blue Box: Cookie Values)

{"event":"gtm.click","event_id":"","message_id":"messageId-1763588567757-9891404271147-CRGJ0H3C77UD2MA16VR0","is_onsi te":false,"timestamp":"2025-11-19T21:42:47.757Z","context":{"ad":{"sdk_env":"external","jsb_status":2},"device":{"platform":"pc"},"u ser":{"anonymous_id":"01KA9XRW9Y2WEWMJ9JJWZV0HF0_.tt.1"},"pixel":{"code":"CRGJ0H3C77UD2MA16VR0","runtime":"1"},"pag e":{"url":"https://www.hellosugar.salon/salon-finder?state=California&location=CA%20Montebello%20%7C%20Montebello%20M ix%20174&service=Buttocks%20Strip%20Wax&category=Buttocks","referrer":"https://www.hellosugar.salon/salon-finder?state= California&location=CA%20Montebello%20%7C%20Montebello%20Mix%20174&items=Buttocks%7CButtocks%20Strip%20Suga r%3BButtocks%7CButtocks%20Strip%20Wax%3B","load_progress":"2"},"library":{"name":"pixel.js","version":"2.2.1"},"session_id":"fb 8113ae-c58d-11f0-b476-02001729c02c::fNrzQC63LRuW4XsLowiy-CRGJ0H3C77UD2MA16VR0","pageview_id":"fb8113ae-c58d-11 f0-b476-02001729c02c-ZfGTX.1.11::039dc0e0-c58e-11f0-8a27-b83fd291a432-CRGJ0H3C77UD2MA16VR0","variation_id":"traffic_ 2,traffic_3::default","csid":"1763585884092::n5i94HWNFFkk8Ub5BA2Q","page_csid":"1763585882660::OuYM18q80FSTwGv1pRr 6","csct":2,"userAgent":"Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/142.0.0.0 S afari/537.36"},"_inspection":{"inter_id":"1-1763588567746-1008-477-27","vids":"74539885,74653886,74653904,74813232"},"prope rties":{"gtm_version":"0_2_01:05","event_trigger_source":"GoogleTagManagerClient","currency":"USD","value":0},"partner":"Google TagManagerClient","signal_diagnostic_labels":{"raw_email":{"label":"missing"},"raw_auto_email":{"label":"missing"},"raw_phone":{"l abel":"missing"},"raw_auto_phone":{"label":"missing"},"hashed_email":{"label":"missing"},"hashed_phone":{"label":"missing"},"raw_e b_email":{"label":"missing"},"raw_eb_phone":{"label":"missing"}}}



| Name | Value | Domain |
|---|---|---|
| _ttp | 351YhvgEERaqLOD9aJHxW7jLAjD | .tiktok.com |

**Figure 4** (Black Box: Data Disclosed; Blue Box: Cookie Values)

112.   Defendant discloses even more confidential details about the appointment information and personal information about the user to Third Parties in various forms throughout the booking process.

113.   For example, Defendant enabled the c_user, datr, fr, sb, and sx cookies which enables Meta to identify its account holders.  The c_user cookie value, which is a unique identifier assigned to each Facebook user allows Meta to associate its users with the interactions on Defendant's Website. *See e.g.* Fig. 1.

114.   Similarly, Google, as enabled by Defendant receives a unique gid and DSID value to assist it in identifying its users. *See e.g.* Fig. 2–3.

115.   Take, for example, TikTok's tracking technologies.  Plaintiff and other users of Defendant's Website are prompted to enter their email address, phone number and name to confirm their bookings.  When users click the "continue" button after inputting this information TikTok receives the client's hashed phone number

and email, which it associates with the client's booking details (e.g. location and procedure type. *See e.g.* Fig. 5. TikTok is also able to associate this information with the _ttp cookie.

```
"user": {
    "anonymous_id": "01KA9XRW9Y2WEWMJ9JJWZV0HF0_.tt.1",
    "auto_phone_number": "332d1ea7aff29aee36646c3c7292ab5f3c42c3b9aa1f0ea25b312a5c6b4ad808",
    "auto_email": "bf77e5c33ab7b3aa7e38585cc399fc82378a3d2d38a0374c080d2bf20458cc80"
},
```

**Figure 5**

### H.   Defendant Did Not Anonymize Client Data By Disclosing "Hashed" Values To Third Parties

116.   The Federal Trade Commission routinely evaluates privacy representations by companies. When it comes to hashing the FTC has said the following:

> Companies often claim and act as if data that lacks clearly identifying information is anonymous, but data is only anonymous when it can never be associated back to a person. If data can be used to uniquely identify or target a user, it can still cause that person harm.
>
> One way that companies obscure personal data is through "hashing." Hashing involves taking a piece of data—like an email address, a phone number, or a user ID—and using math to turn it into a number (called a hash) in a consistent way: the same input data will always create the same hash.
>
> . . .
>
> This logic is as old as it is flawed—hashes aren't "anonymous" and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized. FTC staff will remain vigilant to ensure companies are following the law and take action when the privacy claims they make are deceptive.[31]

---

[31] *No, hashing still doesn't make your data anonymous*, FEDERAL TRADE COMMISSION (Jul. 24, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous.

117.   Thus, Defendant sent and Third Parties intercepted Plaintiff and Class Members personally identifiable information regardless of whether it was hashed or plain text.

**I.     Tolling**

118.   Any applicable statutes of limitations have been tolled by Defendant's knowing and active concealment of its incorporation of the Tracking Technologies onto the Website.

119.   The Tracking Technologies are entirely invisible to a website visitor.

120.   Through no fault or lack of diligence, Plaintiff and members of the putative classes were deceived and could not reasonably discover Defendant's deceptive and unlawful conduct.

121.   Plaintiff and members of the putative class were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

122.   Defendant had exclusive knowledge that the Website incorporated the Third Parties' Tracking Technologies and yet failed to disclose to its users, including Plaintiff, that by purchasing Defendant's products through the Website, their PII and appointment information would be disclosed to Third Parties.

123.   Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its users PII and appointment information.  In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its users that it has disclosed or released their PII and purchase information to unauthorized third parties.  Accordingly, Defendant is estopped from relying on any statute of limitations.

124.   Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

125.   The earliest that Plaintiff, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the

1  filing of the initial complaint in this matter.

## CLASS ALLEGATIONS

2

3  126.  **Class Definition:** Plaintiff brings this action individually and on behalf

4  of various classes of persons similarly situated, as defined below, pursuant to Rule

5  23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

6  The **Nationwide Class** that Plaintiff seeks to represent is defined as:
7  All individuals residing in the United States who booked an
   appointment for services on the website,
8  www.hellosugar.salon, during the Class Period.

9  The **California Subclass** that Plaintiff seeks to represent is defined as:
10  All individuals residing in California who booked an
    appointment for services on the website,
11  www.hellosugar.salon, during the Class Period.

12  127.  The "Class Period" is the time period beginning on the date established

13  by the Court's determination of any applicable statute of limitations, after

14  consideration of any tolling, concealment, and accrual issues, and ending on the date

15  of entry of judgment.

16  128.  The Nationwide Class and California Subclass are referred to

17  collectively as the "Classes."

18  129.  Excluded from the proposed Classes are Defendant; any affiliate,

19  parent, or subsidiary of Defendant, any entity in which Defendant has a controlling

20  interest; any officer, director, or employee of Defendant, any successor or assign of

21  Defendant; anyone employed by counsel in this action; any judge to whom this case

22  is assigned, his or her spouse and immediate family members; and members of the

23  judge's staff.

24  130.  Plaintiff reserves the right to amend the definitions of the Class or

25  Subclass and add subclasses if further information and discovery indicate that the

26  definitions should be narrowed, expanded, or otherwise modified.

27  131.  **Numerosity:** Members of the Classes are so numerous that joinder of

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                        28

all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time.  However, it is estimated that there are at least thousands of individuals in the Classes.  The identity of such membership is readily ascertainable from Defendant's and Third Parties' records.

132.  **Existence and Predominance of Common Questions of Fact and Law:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Classes.  The questions of law and fact common to the proposed Classes predominate over questions affecting only individual class members.  Such questions include, but are not limited to, the following:

    a.  Whether Defendant's acts and practices violated the ECPA.

    b.  Whether Defendant's acts and practices violated CIPA § 631;

    c.  Whether Defendant's acts and practices violated CIPA § 632;

    d.  Whether Defendant's acts and practices violated the privacy rights of Plaintiff and members of the California Class under the California Constitution; and

    e.  Whether Plaintiff and members of the proposed Classes are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

133.  **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the Plaintiff, like all other class members, visited the Website and had his confidential electronic communications intercepted and disclosed to Third Parties.

134.  **Adequacy:** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Classes he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

135.   **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Classes.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.  Finally, Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Classes as a whole.

## CAUSES OF ACTION

### COUNT I
**Violation Of The Electronic Communication Privacy Act,
18 U.S.C. § 2511, *et seq.*
(On Behalf of the Nationwide Class)**

136.   Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

137.   Plaintiff brings this claim on behalf of himself and members of the Nationwide Class.

138.   The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

139.   The ECPA protects both sending and the receipt of communications.

140.   18 U.S.C. § 2520(a) provides a private right of action to any person

whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

141.    The transmission of Plaintiff's sensitive and personal information to Defendant's website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

142.    The transmission of PII between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

143.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. § 2510(8).

144.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

145.    The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]"  18 U.S.C. § 2510(5).

146.    The following instruments constitute "devices" within the meaning of the ECPA:

    a. The computer codes and programs Defendant and Meta used to track Plaintiff's and Class Members' communications while they were navigating the Website;

    b. The computer codes and programs Defendant and Google used to track Plaintiff's and Class Members' communications while they were navigating the Website;

  c. The computer codes and programs Defendant and TikTok used to track Plaintiff's and Class Members' communications while they were navigating the Website;

  d. Plaintiff's and Class Members' browsers;

  e. Plaintiff's and Class Members' mobile devices;

  f. Defendant's and Meta's web and ad servers;

  g. Defendant's and Google's web and ad servers;

  h. Defendant's and TikTok's web and ad servers;

  i. The plan that Defendant and Meta carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website;

  j. The plan that Defendant and Google carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website; and

  k. The plan that Defendant and TikTok carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

147. Plaintiff's and Class Members' interactions with Defendant's website are electronic communications under the ECPA.

148. By utilizing and embedding the tracking technologies provided by Meta, Google, and TikTok on the Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

149. Specifically, Defendant intercepted—in real time—Plaintiff's and Class

Members' electronic communications via the tracking technologies provided by Third Parties its website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and sensitive and personal information to Third Parties.

150.    The Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding their PII, including their identities and information related to their private waxing appointments.  This confidential information is then monetized for targeted advertising purposes, among other things.

151.    By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to Third Parties through the Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

152.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

153.    Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy.

154.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

155.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may award statutory damages to Plaintiff and Class Members; injunctive and

declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably earned.

## COUNT II
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 631
### (On Behalf of the California Subclass)

156. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

157. Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

158. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630–638. CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

159. A person violates California Penal Code § 631(a), if:

> By means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

160.   Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

161.   To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

162.   At all relevant times, Defendant aided, agreed with, and conspired with the Third Parties to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website.  These communications were intercepted without the authorization and consent of Plaintiff and Class Members

163.   Defendant, when aiding and assisting the Third Parties' wiretapping and eavesdropping, intended to help the Third Parties learn some meaning of the content in the URLs and the content the visitor requested.

164.   The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Technologies fall under the broad catch-all category of "any other manner":

    a.   The computer codes and programs the Third Parties used to track Plaintiff and Class Members' communications while they were navigating www.hellosugar.salon;

    b.   Plaintiff's and Class Members' browsers;

    c.   Plaintiff's and Class Members' computing and mobile devices;

    d.   Meta's web and ad servers;

    e.   Google's web and ad servers;

    f.   TikTok's web and ad servers;

    g.   The web and ad-servers from which the Third Parties tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.hellosugar.salon;

h.  The computer codes and programs used by the Third Parties to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.hellosugar.salon; and

i.  The plan the Third Parties carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to visit www.hellosugar.salon.

165.  The information that Defendant transmitted using the Tracking Technologies constituted sensitive and confidential personally identifiable information.

166.  As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting the Third Parties to receive its customers' sensitive and confidential online communications through the Website without their consent.

167.  As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 per violation or three times the amount of actual damages.  Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered or be threatened with, actual damages." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**COUNT III**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**
**(On Behalf of the California Subclass)**

168.  Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

169.  Plaintiff brings this claim against Defendant individually and on behalf

of the California Subclass.

170.    Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication.

171.    Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

172.    The data collected on Defendant's Website constitutes "confidential communications," as that term is used in Section 632, because class members had an objectively reasonable expectation of private with respect to their personally identifiable information.

173.    Plaintiff and Class Members expected their communications to Defendant to be confined to Defendant in part, because of Defendant's consistent representations that these communications would remain confidential.  Plaintiff and Class Members did not expect third parties, and specifically Met, Google, and TikTok, to secretly eavesdrop upon or record this information and their communications.

174.    The Tracking Technologies from Third Parties, are all electronic amplifying or recording devices for purposes of § 632.

175.    By contemporaneously intercepting and recording Plaintiff's and Class members' confidential communications to Defendant through this technology, the Third Parties eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

176.    At no time did Plaintiff or Class members consent to Defendant or Third Parties conduct, nor could they reasonably expect that their communications to Defendant would be overheard or recorded by Third Parties.

177.    The Third Parties utilized Plaintiff's and Class members' personally

identifiable information for their own purposes, including advertising and analytics.

178.    Defendant is liable for aiding and abetting violations of Section 632 by the Third Parties (i.e., Meta, Google, and TikTok).

179.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Members of the California Subclass have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**COUNT IV**
**Invasion of Privacy Under California's Constitution**
**(On Behalf of the California Subclass)**

180.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

181.    Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

182.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination of their sensitive, confidential online communications; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

183.    At all relevant times, by using the Tracking Technologies to record and communicate their sensitive and confidential online communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

184.    Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, and other data would remain confidential and that Defendant would not install wiretaps on www.hellosugar.salon.

185.    Plaintiff and Class Members did not authorize Defendant to record and

transmit Plaintiff's and Class Members' sensitive confidential online communications.

186.   The invasion of privacy was serious in nature, scope, and impact because it related to their sensitive and private online communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

187.   Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)   For an order certifying the putative Nationwide Class and California Subclass defined above, naming Plaintiff as the representative of the putative Classes, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class and Subclass Members;

(b)   For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c)   For an order finding in favor of Plaintiff and the putative Classes on all counts asserted herein;

(d)   For statutory damages in amounts to be determined by the Court and/or jury;

(e)   For prejudgment interest on all amounts awarded;

(f)   For injunctive relief as pleaded or as the Court may deem proper; and

(g)   For an order awarding Plaintiff and the putative Classes their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury of any and all issues in this action so triable of right.

Dated:  December 1, 2025            Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: _/s/ Sarah N. Westcot_
      Sarah N. Westcot

Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Counsel for Plaintiff*